## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| NATHAN C. SILVA, Derivatively on Behalf of Nominal Defendant ELEVANCE HEALTH, INC., | ) ) ) | |
| | ) | Case No. 1:25-cv-01270 |
| Plaintiff, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| GAIL K. BOUDREAUX, FELICIA F. NORWOOD, MARK B. KAYE, STEPHEN V. TANAL, R. KERRY CLARK, SUSAN D. DEVORE, ROBERT L. DIXON, JR., LEWIS HAY, III, BAHIJA JALLAL, ANTONIO F. NERI, RAMIRO G. PERU, RYAN M. SCHNEIDER, DEANNA D. STRABLE, and ELIZABETH E. TALLETT, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ELEVANCE HEALTH, INC., | ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nathan C. Silva ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Elevance Health, Inc. ("Elevance" or the "Company"), against certain of the Company's executive officers and its board of directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including the review of publicly available information regarding the Company; the allegations of a class action

complaint filed in the securities class action captioned *Miller v. Elevance Health, Inc. et al.,* Case No. 1:25-cv-00923-KNS (S.D. Ind. May 12, 2025) (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Elevance; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of Elevance against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least April 18, 2024 and October 16, 2024, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.      Elevance is an American healthcare company that provides a variety of health insurance products, including individual and group plans, Medicaid, and Medicare.

3.      In 2023, the Company provided Medicaid coverage in 26 states and the District of Columbia. In its provision of Medicaid coverage, Elevance negotiates premium rates with each state on an annual basis, based on the expected cost to provide benefits to that state's recipients.

4.      In calculating these expected costs, the Company considers various factors, including the average level of care that recipients will require, referred to as "acuity," and the recipients' utilization of the health benefits.

5.      Each year, states conduct a redetermination process, which involves reviewing

Medicaid recipients for eligibility and removing those who no longer qualify. In response to the COVID-19 pandemic, the federal government temporarily suspended the redetermination process, leading to a substantial increase in the number of Medicaid recipients nationwide. The federal government permitted states to resume redeterminations on April 1, 2023. Most states were projected to conclude the redetermination process by June 2024.

6.     Throughout the Relevant Period, Company management issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) after redetermination, patients with greater medical needs tended to remain on Medicaid; (ii) this increased acuity led to higher per-patient costs for the Company; (iii) in addition to increased acuity, redeterminations were causing increased utilization rates; (iv) Company management overstated the Company's visibility into Medicaid redeterminations; (v) despite some acknowledgements that Medicaid expenses were rising, Company management represented that this was adequately reflected in the Company's guidance; (vi) Elevance failed to account for the increased acuity and utilization in its rate negotiations with states; and (vii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

7.     The truth began to emerge on July 17, 2024, when Company management revealed that Elevance was "expecting second-half utilization to increase in Medicaid." On this news, the price of Elevance stock declined 5.8%, from a close of $553.14 per share on July 16, 2024 to a close of $520.93 per share on July 17, 2024. Despite this disclosure, the price of Elevance stock remained artificially inflated as Company management continued to issue materially false and misleading statements.

8.      The full truth emerged on October 17, 2024, when the Company reported third quarter adjusted diluted EPS that was below expectations and lowered its full-year EPS outlook. Company management attributed the disappointing financial results to "accelerated cost trends in Medicaid throughout the third quarter" related to "higher overall membership acuity."

9.      On this news, the price of Elevance stock declined 10.6%, from a close of $496.96 per share on October 16, 2024 to a close of $444.35 per share on October 17, 2024.

10.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

11.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act, Rule 10b-5 (17 C.F.R.§240.10b-5)

promulgated thereunder by the SEC, and Section 21D of the Exchange Act.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Elevance maintains its principal executive offices in this District and is incorporated in this District, and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

17.    Plaintiff is, and has been at all relevant times, a shareholder of Elevance.

*Nominal Defendant*

18.    Nominal Defendant Elevance is incorporated under the laws of the State of Indiana.

19.    The Company's principal executive offices are located at 220 Virginia Avenue, Indianapolis, Indiana 46204. Elevance's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ELV."

*Individual Defendants*

20.    Defendant Gail K. Boudreaux ("Boudreaux") has served as the Company's

President and Chief Executive Officer ("CEO") and as a member of the Board at all relevant times. Defendant Boudreaux is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Boudreaux received $20,471,976 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Boudreaux beneficially owned 389,716 shares of Elevance common stock, worth roughly $157.9 million.[1]

21.     Defendant R. Kerry Clark ("Clark") has served as a member of the Board at all relevant times and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Clark received $375,000 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Clark beneficially owned 9,039 shares of Elevance common stock, worth roughly $3.7 million.

22.     Defendant Susan D. DeVore ("DeVore") has served as a member of the Board at all relevant times. According to the Company's public filings, Defendant DeVore received $345,000 in 2024 in compensation from the Company. As of February 1, 2025, Defendant DeVore beneficially owned 1,701 shares of Elevance common stock, worth $689,075.

23.     Defendant Robert L. Dixon, Jr. ("Dixon") has served as a member of the Board at all relevant times. According to the Company's public filings, Defendant Dixon received $352,613 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Dixon beneficially owned 9,721 shares of Elevance common stock, worth roughly $3.9 million.

24.     Defendant Lewis Hay, III ("Hay") has served as a member of the Board at all relevant times and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Hay received $345,000 in 2024 in

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $405.10 per share closing price of Elevance common stock on February 3, 2025, the next trading day after February 1, 2025.

compensation from the Company. As of February 1, 2025, Defendant Hay beneficially owned 10,906 shares of Elevance common stock, worth roughly $4.4 million.

25.    Defendant Bahija Jallal ("Jallal") has served as a member of the Board at all relevant times. According to the Company's public filings, Defendant Jallal received $392,613 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Jallal beneficially owned 4,187 shares of Elevance common stock, worth roughly $1.7 million.

26.    Defendant Antonio F. Neri ("Neri") has served as a member of the Board at all relevant times and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Neri received $352,613 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Neri beneficially owned 4,324 shares of Elevance common stock, worth roughly $1.8 million.

27.    Defendant Ramiro G. Peru ("Peru") has served as Chair of the Board since May 2025 and as a member of the Board since 2004. According to the Company's public filings, Defendant Peru received $392,613 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Peru beneficially owned 8,744 shares of Elevance common stock, worth roughly $3.5 million.

28.    Defendant Ryan M. Schneider ("Schneider") has served as a member of the Board at all relevant times and served as Chair of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Schneider received $376,374 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Schneider beneficially owned 5,999 shares of Elevance common stock, worth roughly $2.4 million.

29.    Defendant Deanna D. Strable ("Strable") has served as a member of the Board at all relevant times and served as a member of the Audit Committee during the Relevant Period.

According to the Company's public filings, Defendant Strable received $345,000 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Strable beneficially owned 1,045 shares of Elevance common stock, worth $423,330.

30.    Defendant Elizabeth E. Tallett ("Tallett") served as Chair of the Board from 2013 until her departure from the Company in May 2025. According to the Company's public filings, Defendant Tallett received $605,000 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Tallett beneficially owned 10,291 shares of Elevance common stock, worth roughly $4.2 million.

***Officer Defendants***

31.    Defendant Felicia F. Norwood ("Norwood") has served as the Company's Executive Vice President & President, Government Health Benefits at all relevant times. Defendant Norwood is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Norwood received $6,288,946 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Norwood beneficially owned 84,720 shares of Elevance common stock, worth roughly $34.3 million.

32.    Defendant Mark B. Kaye ("Kaye") has served as the Company's Executive Vice President & Chief Financial Officer at all relevant times. Defendant Kaye is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Kaye received $6,873,144 in 2024 in compensation from the Company. As of February 1, 2025, Defendant Kaye beneficially owned 11,112 shares of Elevance common stock, worth roughly $4.5 million.

33.    Defendant Stephen V. Tanal ("Tanal") has served as the Company's Chief Financial Officer, Government Health Benefits. Prior to serving in that role, Defendant Tanal

served as the Company's Vice President, Investor Relations from February 2021 until November 2024. Defendant Tanal is named as a defendant in the Securities Class Action.

<u>**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

34.    Because of their positions as officers and/or directors of Elevance, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Elevance and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

35.    Therefore, the Individual Defendants were required to act in furtherance of the best interests of Elevance and its shareholders.

36.    Each director and officer of the Company owes to Elevance and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Elevance, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Elevance, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding, *inter alia*: the Company's visibility into Medicaid redeterminations and its Medicaid expense trends, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.    To discharge their duties, the officers and directors of Elevance were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Elevance were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Indiana and the United States, and pursuant to Elevance's own Code of Conduct;

(b)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)    Remain informed as to how Elevance conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Elevance and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Elevance's operations would comply with all applicable laws and Elevance's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the

misconduct and prevent its recurrence.

41.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Elevance.

42.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Elevance and were at all times acting within the course and scope of such agency.

43.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

47.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Elevance, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

49.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Elevance and at all times acted within the course and scope of such agency.

## ELEVANCE'S CODE OF CONDUCT

50.    Elevance's Code of Conduct begins with a message from Defendant Brondeau, which states, in pertinent part:

> Elevance Health is a company grounded in ethical behavior. Each of us is responsible for creating a work environment that promotes accountability, integrity, and trust — for one another, as well as for the consumers, communities, care providers, shareholders, and regulators who depend on us.
>
> The way we do business is as important as the outcomes we achieve. On our journey to become a lifetime, trusted health partner, it is imperative that we continue to exercise the highest standards of ethics and professional behavior and live by our Code of Conduct.
>
> Our Code serves as the foundation of our Ethics, Compliance, and Privacy Program. Rooted in our value of Integrity, it provides clear guidelines for doing what's right and acting morally and responsibly in everything we do as Elevance Health associates. It helps us fulfill our commitments, ensure a high level of service and respect for others, build transparency and trust among our diverse stakeholders, and go above and beyond in service of our mission.

51.    The Code of Conduct applies to all "associates, officers, and directors of Elevance Health, its affiliates, and subsidiaries . . . and our business partners," and violations of the Code of Conduct will lead to "corrective action," including "termination of employment."

52.    In a subsection titled "Making Ethical Decisions," the Code of Conduct states:

The Code and our policies cannot replace our own sense of integrity and good judgment. We must do what is right. We are responsible to act with unquestionable ethics in all business matters. We must never commit or ask others to commit unethical or illegal acts. We should immediately report any request or direction to commit an act we think may be illegal or unethical.

53.    With respect to financial reporting, the Code of Conduct states:

Concerns regarding accounting, auditing, and internal accounting controls deserve special mention because they could affect our financial reporting obligations. We must report concerns about accounting, auditing, and internal accounting control deficiencies or non-compliance to the Ethics Department using one of the channels previously identified. Some examples include, but are not limited to:

- False statements or deliberate errors in the recording and maintaining of Elevance Health financial records and those of its subsidiaries

- False statements or deliberate errors in the preparation, evaluation, review, or audit of any Elevance Health, and its subsidiaries

- Financial statements, and deficiencies in or non-compliance with Elevance Health's internal accounting controls or policies.

54.    With respect to the Company's business records, the Code of Conduct states, in pertinent part:

Accurate, complete, and truthful financial, operational, and other business records are vital to our decision-making processes. They directly impact our compliance with financial, legal, and regulatory reporting requirements.

Inaccurate, incomplete, or false financial or operational information provided in connection with certifications of government contracts and other entities is strictly prohibited.

55.    In a subsection titled "Public Speaking and Media Relations," the Code of Conduct states, in pertinent part, that "[t]o provide accurate and complete, and consistent information about

14

Elevance Health's business to the media, investment community, and external audience, all news media and thought leadership opportunities will be responded to in a timely and professional manner."

56.    With respect to the Company's corporate assets, the Code of Conduct states:

We should only use company funds, equipment, and other assets to conduct business, or for other reasons as long as they are approved by a manager. Company assets, such as telephone and email, are to be used in a professional, productive, ethical, and lawful manner. We should not use, sell, or dispose of company assets unless allowed by policy.

57.    With respect to conflicts of interest, the Code of Conduct states, in pertinent part:

We are required to perform our responsibilities in a manner that furthers Elevance Health's interests. We must not compromise those interests due to actual or perceived conflicts with other business or personal concerns. A conflict of interest arises when our personal interests or activities appear to influence, or may influence, our ability to act in the best interests of Elevance Health.

58.    In a section titled "Conducting Elevance Health's Business," the Code of Conduct states, in pertinent part, that "[w]e deal fairly and honestly in all business dealings."

## ELEVANCE'S AUDIT COMMITTEE CHARTER

59.    Elevance's Audit Committee Charter states that the purpose of the Audit Committee is to:

Assist the Board in overseeing (a) the Company's accounting and financial reporting practices and policies, systems of internal controls over financial reporting, compliance activities and operating effectiveness and efficiencies; (b) the integrity of the Company's consolidated financial statements and the independent audit thereof; (c) the Company's compliance with legal and regulatory requirements including, but not limited to, the Company's Ethics & Compliance Program and Code of Conduct; (d) the performance of the independent registered public accounting firm ("Independent Auditors") and the Company's internal audit function; (e) the Independent Auditors' qualifications and independence; and (f) the Board's process for overseeing the Company's exposure to major risks.

60.    With respect to the Company's internal audit function, the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- To (i) review and concur in the appointment, promotion or dismissal and (ii) review the performance and annual compensation of the Chief Internal Audit Officer, who has direct reporting authority to the Board;

- To review significant internal audit results and management's action plans in response thereto;

- To review and approve (i) the audit plan, including changes resulting from continuous risk assessment, and (ii) the annual budget and staffing of the internal audit function;

- To review the effectiveness and governance of the internal audit activity, including a periodic review and approval of the internal audit charter, which is based on the principles of the Institute of Internal Auditors ("IIA"); and

- In the years an external quality assessment ("QAR") is required, based on IIA principles, to review and approve the Chief Internal Audit Officer's plan for a QAR of the internal audit function, and approve and monitor progress with the Chief Internal Audit Officer's action plans and timeline to address any identified deficiencies and opportunities.

61.    With respect to the Company's "financial reporting practices and policies and system of internal controls over financial reporting," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- To advise management, the internal auditing department and the Independent Auditors that they are expected to provide to the Committee a timely analysis of significant financial reporting issues and practices or changes in such practices;

- To receive and consider any reports or communications submitted to the Committee by the Independent Auditors required to be communicated to the Committee under applicable law, auditing standards or other professional accounting standards;

- To review and discuss (i) with management and the Independent Auditors the annual audited consolidated financial statements and the quarterly interim unaudited consolidated financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Form 10-K or Form 10-Q with the SEC; and (ii) with the Independent Auditors any significant matters arising from any audit, including any audit problems or difficulties and management's response;

- To review (i) the adequacy and effectiveness of the Company's systems of internal controls; and (ii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the consolidated financial statements of the Company;

- To oversee management's compliance with the National Association of Insurance Commissioner's Annual Financial Reporting Model Regulation;

- To receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures;

- To review and discuss with management the earnings press releases, including the use and reconciliation of non-GAAP financial measures as well as the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies; and

- To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding the federal securities laws, including accounting, internal accounting controls and auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding such matters.

62.    With respect to the Company's risk management function, the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- To review the appointment, promotion, or dismissal of the Chief Enterprise Risk Management Officer;

- To review and discuss management's enterprise risk management framework, processes and governance structure designed to identify, bring to the Board's attention and appropriately assess, monitor and manage the Company's exposure to major risks;

- To review and discuss the Company's major financial risk exposures and any other categories of risk delegated by the Board to the Committee from time to time and the steps management has taken to assess, monitor and manage such exposures; and

- To discuss the responsibilities, budget and staffing of the risk management function.

## SUBSTANTIVE ALLEGATIONS

### Background

63.    Elevance is an American healthcare company that provides a variety of health insurance products, including individual and group plans, Medicaid, and Medicare.

64.    In 2023, the Company provided Medicaid coverage in 26 states and the District of Columbia. In its provision of Medicaid coverage, Elevance negotiates premium rates with each state on an annual basis, based on the expected cost to provide benefits to that state's recipients.

65.    In calculating these expected costs, the Company considers various factors, including acuity and utilization rates.

66.    Each year, states conduct a redetermination process, which involves reviewing Medicaid recipients for eligibility and removing those who no longer qualify. In response to the COVID-19 pandemic, the federal government temporarily suspended the redetermination process, leading to a substantial increase in the number of Medicaid recipients nationwide.

67.    The federal government permitted states to resume redeterminations on April 1, 2023. Most states were projected to conclude the redetermination process by June 2024.

### Materially False and Misleading Statements

68.    On April 18, 2024, Elevance hosted its first quarter 2024 earnings call (the "1Q24 Earnings Call"). During the call, the Company raised its EPS guidance for the year "by $0.10 to be greater than $37.20," based on its first quarter performance. Defendant Boudreaux explained that, "[i]n the first quarter, our Medicaid business performed in line with our expectations." In response to a question regarding the Company's increased guidance, Defendant Kaye stated that, "given our business is subject to some variability around medical cost trends, *we're intentionally*

*remaining thoughtful and prudent in our outlook*."[2]

69.    In response to a question regarding the "risk pool and rate adequacy" of Medicaid now that roughly 90% of members had been reviewed pursuant to the redetermination process, Defendant Norwood stated:

> *[T]he acuity is in line with what we expected*. And I will also say that at this point *we have visibility into 75% of our Medicaid rates and premiums for 2024. The vast majority of those are in line with our expectations and they're actuarially sound*. As you know, we have ongoing conversations with our state partners as we go throughout this process, and we expect those rates to continue to be actuarially sound. So we're going to continue to work with our state partners. . . . And we're going to make sure that we go through this process with a lot of discipline and rigor, understand the mix of our membership and the leavers versus stayers as we go through this process.

70.    During the 1Q24 Earnings Call, while Defendant Kaye conceded that the Company's Medicaid business did "experience increased, but state-specific utilization attributed to the redetermination mix impacts," he maintained that "we remain very comfortable with what we're seeing there, given those ongoing constructive dialogs with the impacted states." Defendant Kaye continued, stating that "*you could expect Medicaid margins to normalize given we already have line of sight . . . into approximately 75% of the Medicaid premiums for 2024 and that we are comfortable with the actuarial soundness of the rates that we are seeing*. Over the long term, Medicaid continues to normalize as we spoke about last quarter, and it is performing as expected."

71.    On June 12, 2024, Defendant Tanal participated at the Goldman Sachs Global Healthcare Conference on behalf of the Company. During the conference, Defendant Tanal claimed that "a range of outcomes is assumed in our guidance" and that, while the Company had observed some changes in the risk pool, it was "*nothing outside of the bounds of what we've expected and guided for*." Defendant Tanal touted the Company's visibility into Medicaid

---

[2] Unless indicated otherwise, all emphasis is added.

redeterminations, stating that "*we were set up to monitor acuity and utilization very intently and to have active dialogues with our states. So we're talking to all of our states almost monthly at this point. . . . Broadly, rates are actuarially sound as well*."

72.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) after redetermination, patients with greater medical needs tended to remain on Medicaid; (ii) this increased acuity leads to higher per-patient costs for the Company; (iii) in addition to increased acuity, redeterminations were causing increased utilization rates; (iv) the Individual Defendants overstated the Company's visibility into Medicaid redeterminations; (v) despite some acknowledgements that Medicaid expenses were rising, the Individual Defendants represented that this was adequately reflected in the Company's guidance; (vi) Elevance failed to account for the increased acuity and utilization in its rate negotiations with states; and (vii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects, including statements touting the "actuarial soundness" of its rates, were materially misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

73.    On July 17, 2024, the Company hosted its second quarter 2024 earnings call (the "2Q24 Earnings Call"). During the call, Defendant Boudreaux disclosed that "[a]s a result of redeterminations, our Medicaid membership mix has shifted, resulting in increased acuity." Defendant Kaye additionally revealed that the Company was now "*expecting second-half utilization to increase in Medicaid*," adding that Elevance was "*seeing signs of increased utilization across the broader Medicaid population*, including in outpatient home health, radiology, durable medical equipment, as well as some elective procedures." Defendant Norwood

acknowledged  "*the potential for a short-term disconnect between the timing of our rates and the emerging acuity in our populations*."

74.     On this news, the price of Elevance stock declined 5.8%, from a close of $553.14 per share on July 16, 2024 to a close of $520.93 per share on July 17, 2024.

75.     Despite this disclosure, the price of Elevance stock remained artificially inflated as the Individual Defendants continued to mislead the investing public by claiming that the increased costs were reflected in the Company's guidance. For instance, during the 2Q24 Earnings Call, Defendant Kaye represented that "we now expect our full-year benefit expense ratio to be in the upper half of that initial guidance range, i.e., 87% to 87.5%." Defendant Boudreaux stated that Elevance had "prudently maintained [its] full-year outlook given industry-wide dynamics we are navigating in our Medicaid business." Defendant Kaye similarly stated that the "*full-year outlook does allow for both this shift in acuity and increased utilization in the second half of the year*," adding that the Company was "*closely monitoring acuity and cost trends, notably in Medicaid, and working collaboratively with states to ensure rates remain actuarially sound*." Defendant Kaye concluded that, "[n]onetheless, we expect to achieve our full-year adjusted diluted earnings per share guidance of at least $37.20."

76.     The full truth emerged on October 17, 2024, when the Company hosted its third quarter 2024 earnings call (the "3Q24 Earnings Call"). During the call, Defendant Boudreaux disclosed that the Company's "third quarter adjusted diluted earnings per share were $8.37, which was below our expectations, *primarily due to elevated medical costs in our Medicaid business*." Additionally, despite reiterating EPS guidance just three months earlier, the Company lowered its full-year outlook for adjusted diluted EPS from $37.20 to "approximately $33." Defendant Boudreaux characterized the issues as "*timing disconnects between Medicaid rates and acuity*,"

explaining that "*[w]hile the rate increases we've received are the highest in the past decade, they are still inadequate to cover 2024 cost trends that we now expect to be 3 to 5 times historical averages*."

77.    Also during the 3Q24 Earnings Call, Defendant Kaye revealed that "[t]he consolidated benefit expense ratio was 89.5% for the third quarter, an increase of 270 basis points year-over-year, principally due to *Medicaid cost trend developing worse than expected*." Defendant Kaye explained that "*we experienced accelerated cost trends in Medicaid throughout the third quarter.* And additionally, we saw unfavorable prior-period development related to the current year, specifically in our Medicaid business." Defendant Kaye added that "*[t]he elevated level of cost trend is driven. . . primarily by the higher overall membership acuity, given the redetermination cycle is now substantially complete*."

78.    On this news, the price of Elevance stock declined 10.6%, from a close of $496.96 per share on October 16, 2024 to a close of $444.35 per share on October 17, 2024.

***Stock Repurchases During the Relevant Period***

79.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 1.8 million shares of its own stock, for a total of roughly $866.2 million.

80.    Specifically, the Company made the following repurchases: 392,179 shares for $201,599,615 in April 2024; 363,480 shares for $193,138,733 in May 2024; 130,070 shares for $69,895,716 in June 2024; 102,035 shares for $51,871,533 in July 2024; 20,284 shares for $10,694,333 in August 2024; 1,487 shares for $836,601 in September 2024; and 801,494 shares for $338,174,363 in October 2024. In total, the Company repurchased 1,811,029 shares for

$866,210,894 during the Relevant Period.

81.    Given that the price of Elevance stock was $444.35 after the corrective disclosures on October 17, 2024, the true value of the 1,811,029 repurchased shares was roughly $804.7 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $61.5 million to repurchase these shares.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

83.    Elevance is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

84.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

85.    Plaintiff is an owner of Elevance stock and has been a continuous holder of the Company's common shares at all relevant times.

86.    At the time this action was commenced, the ten-member Board was comprised of Defendants Boudreaux, Clark, DeVore, Dixon, Hay, Jallal, Neri, Peru, Schneider, and Strable. Accordingly, Plaintiff is only required to show that five directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this

action is not necessary because such a demand would have been a futile act.

87.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

88.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

89.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Elevance, the Individual Defendants knew, or should have known, the material facts surrounding the Company's Medicaid expense trends and its visibility into the redetermination process.

90.    Defendant Boudreaux is not disinterested or independent and is therefore incapable of considering a demand. Defendant Boudreaux has served as the Company's CEO since 2011. Thus the Company admits that Defendant Boudreaux is a non-independent director pursuant to the

requirements set forth by the NYSE. Furthermore, Defendant Boudreaux is named as a defendant, and faces substantial personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

91.     Defendants Clark, Hay, Neri, Schneider, and Strable served as members of the Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Clark, Hay, Neri, Schneider, and Strable cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

92.     Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Elevance stock and stock options they held.

93.     The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Elevance's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

94.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce the Company's Clawback Policy which provides for the recoupment of "both cash and equity-based incentives in the event of misconduct."

95.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

96.    The acts complained of herein constitute violations of fiduciary duties owed by

Elevance's officers and directors, and these acts are incapable of ratification.

97.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Elevance. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Elevance, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

98.     If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Elevance to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

99.     Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

**Against the Individual Defendants for Violations of § 10(b)
of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Elevance. Not only is Elevance now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Elevance by the Individual Defendants.

102.    During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $61.5 million to repurchase roughly 1.8 million shares.

103.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

104.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Elevance not misleading.

105.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did

control the conduct complained of herein and the content of the public statements disseminated by Elevance.

106.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

107.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Against Defendants Boudreaux, Norwood, Kaye, and Tanal for Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934**

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    Elevance, along with Defendants Boudreaux, Norwood, Kaye, and Tanal (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

110.    The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Elevance securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were

artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

111. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

112. The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

113. Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

114. As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## COUNT III

### Against the Individual Defendants for
### Breach of Fiduciary Duties

115. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation

of good faith, fair dealing, loyalty, and due care.

117.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

118.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

119.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

120.    Plaintiff, on behalf of Elevance, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

121.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

122.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

123.    Plaintiff, on behalf of Elevance, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for
### Unjust Enrichment

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Elevance.

126.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Elevance that was tied to their performance or to the artificially inflated valuation of Elevance.

127.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

128.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

129.    Plaintiff, on behalf of Elevance, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### for Waste of Corporate Assets

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Elevance's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

132.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

133.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf Elevance has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 25, 2025                    **LOCAL COUNSEL**

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**              By:  */s/ Jason A. Shartzer*
Gina M. Serra
Samir Aougab                         Jason A. Shartzer, 23989-49
825 East Gate Boulevard, Suite 300   Shannon B. Mize, 22902-49A
Garden City, NY 11530                SHARTZER LAW FRIM, LLC
Telephone: (516) 683.3516            156 East Market Street, Suite 1000
Facsimile: (302) 654-7530            Indianapolis, IN 46204
Email: tjm@rl-legal.com              Telephone: (317) 969-7600
Email: sa@rl-legal.com               Facsimile: )317)969-7650
                                     Email: jshartzer@shartzerlaw.com
                                     Email: smize@shartzerlaw.com
**GRABAR LAW OFFICE**                [LOCAL COUNSEL]
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103               *Attorneys for Plaintiff*
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com